## Thomson v. Peck.

(Decided January 25, 1927.)

### Appeal from Jefferson Circuit Court (Common Pleas, Second Division).

1. Bills and Notes—Holder of Check May Sue Thereon if it is Not Paid (Ky. Stats., Sections 3720b-61, 3720b-84, 3720b-151, 3720b-185, 3720b-190).—Holder of check may maintain action thereon in case it is not paid, in view of Ky. Stats., sections 3720b-61, 3720b-84, 3720b-151, 3720b-185, 3720b-190.

2. Bills and Notes—Where Stenographer Sent Check Payable to Patent Attorney, Contrary to Instructions, there was, Nevertheless, Delivery to Such Attorney.—Where stenographer made check payable to patent attorney, and sent it to him, though instructed to make it to one who was to indorse it and forward it to such attorney, there was delivery, since stenographer was maker's agent, and attorney knew nothing of secret instructions to her.

3. Bills and Notes—Check from Buyer of Option on Patents to Patent Attorney Held Not Without Consideration, Though Contract to Buy Patents was Never Made.—Check sent by buyer of option on patents to patent attorney, to enable him to pay expenses and continue work on applications, held not without consideration, though maker's contract to buy interest in patents was never made, where attorney took $20 for expenses and continued work.

BECKHAM OVERSTREET and G. F. WYCOFF for appellant.

LEO T. WOLFORK and BRUCE, BULLITT, GORDON & LAURENT for appellee.

OPINION OF THE COURT BY COMMISSIONER HOBSON— Affirming.

W. A. Thomson is a manufacturer in Louisville, Kentucky, H. E. Peck is a patent attorney in Washington, D. C. Peck brought this suit against Thomson to recover on a $500.00 check mailed to him by Thomson. Thomson, after sending the check, notified the bank not to pay it; the bank refused payment and this suit followed. The circuit court gave judgment in favor of Peck and Thomson appeals.

Under the present statute the holder of a check may maintain an action upon the check in case it is not paid, for the statute provides:

"A check is a bill of exchange drawn on a bank payable on demand. Except as herein otherwise

provided, the provisions of this act applicable to a bill of exchange payable on demand apply to a check." Sec. 3720b-185.

" 'Holder' means the payee or endorser of a bill or note who is in possession of it, or the bearer thereof." Sec. 3720b-190.

"The drawer by drawing the instrument admits the existence of the payee and his then capacity to endorse, and acknowledges that on due presentment the instrument will be accepted or paid, or both, according to its tenor, and that if it be dishonored, and the necessary proceedings on dishonor be duly taken, he will pay the amount thereof to the holder, or to any subsequent endorser who may be compelled to pay. . . . " Sec. 3720b-61.

"Subject to the provisions of this act, when the instrument is dishonored by nonpayment, an immediate right of recourse to all parties secondarily liable thereon accrues to the holder." Sec. 3720b-84.

"When a bill is dishonored by nonacceptance, an immediate right of recourse against the drawers and endorsers accrues to the holder and no presentment for payment is necessary." Sec. 3720b-151.

The defendant by his answer denied delivery of the check and pleaded that the check was issued by mistake and was without consideration. The reply controverted the affirmative allegations of the answer and pleaded estoppel.

The facts are these: L. B. Cherry had several applications pending in Washington for patents in the name of the Cherry Process Company. He proposed to sell Thomson an interest in these patents and Thomson paid him $600.00 for an option. After this, in January, Thomson was in Washington and called on Peck, he says socially, Peck says on business. Peck says that while there Thomson agreed to pay his fees. Thomson says he did not. On February 17, 1922, Peck wrote the following letter:

"Cherry Process Company,
65 Our Home Life Building,
Louisville, Kentucky.

"Gentlemen: I am hard at work digging into the great mass of drawings and data worked out by

Mr. Cherry while here, as I have been for many days, in an effort to outline the several patent applications necessary to cover the many process and apparatus features. I hope to have something for execution within a few days. In the meantime will you kindly let me have check, $500.00 on account, as per your request that I do not permit the expenses to run up to large amounts before calling for remittances to cover time and disbursements as we go along.

"With best wishes I beg to remain,

"Yours truly,

(Signed) HUBERT E. PECK,"

On February 25, 1922, Thomson wrote in answer to this letter as follows:

"Mr. Hubert E. Peck,
Pacific Building,
Washington, D. C.

"Dear Mr. Peck:

"Mr. Cherry has returned and we understand he has very important applications in your possession and that you are working strong on them. We sent Mr. Cherry a check for you for $250.00 as retaining fee.

"We also have your letter to Cherry requesting $500.00 additional, on account, which is probably all right. Would you kindly state what this $500.00 is to cover? This is not, of course, intended as any reflection on you, but Cherry's bills in Washington city was out of all reason; in fact they included $120.00 for whiskey, which is almost too absurd for consideration.

"You warned me not to give him complete authority on his expense account. We have been trying to hold him down but it almost seems impossible. He wants $500.00 a month for his living expenses. We had no contract whatever with him covering this question, as he has nothing; assume we will be forced to take care of him. Your end of the expense account will and must be taken care of, but it is quite evident that we will be required to keep your account apart, as anything spent on Cherry now

must be charged up to him. Is it possible that the C. & C. Developing Company has some interest in his former patents? There is considerable mystery about it. He is bringing his family away from Kansas City and is very much afraid of being sued by this Kansas City company.

"He seems like a straightforward fellow, but we have recently gone through a considerable experience with Webster Stevens and we do not want to get into a similar case with Cherry. It is entirely a gamble on my part, of course, and we want to keep as close to shore as possible.

"Yours very truly,<br>(Signed) W. A. THOMSON."

On February 27, 1922, Peck wrote Thomson the following letter:

"Mr. W. A. Thomson,
Louisville, Kentucky.      (Confidential)

"My Dear Mr. Thomson:

"The facts set forth by your letter of the 25th inst. are most astounding, but I find that we cannot deal with a genius as we can with the ordinary run of business and professional man. I have always found Cherry frank and honest and in his dealings with me, and furthermore it is my opinion that he has a most wonderful knowledge of his subject and a most marvelous inventive mind; however he is as a child in such matters as you complain of. Of course I did not see him outside of office hours nor did I see him at his hotel, but when with me he showed no signs indicating undue use of liquor, but worked hard and long with me, and did an enormous amount of work and development when not with me. Nevertheless you must use your own judgment, as you will, in this matter, and you must not be influenced by what I say, as I have no business dealings with Cherry except as a patent attorney. You must also do your own investigating as to C. & C. Development Company, as I do not know the exact situation. I cannot secure remittances from C. & C. nor instructions as to a large number of Cherry foreign cases. However, if C. & C. does not pay these bills I look to

Cherry Process for settlement, as the cases I understand revert to Cherry Process Company if C. & C. does not pay up. Cherry Process Company owes me considerable money in this way and for other work, in addition to the enormous amount of work taken up for Cherry Process sincce Cherry arrived here. As a matter of fact, I do not know you in this patent work, as it is being conducted for Cherry Process Company and assignments to Cherry Process Company are being forwarded with the applications. A very important application went forward to this company with assignment a few days ago, and another is about ready to go forward.

"On the first inst. Cherry gave me Cherry Process Company check for $250.00 as a retainer, but this amount has long since been overbalanced by charges, as will appear by bills forwarded to that company. I cannot let these bills pile up without further remittances, as I have no information as to the resources of Cherry Process Company, and must have remittances from time to time to cover me against such loss as I may suffer in the C. & C. matter. I hence expect check from Cherry Process as per my letter calling for $500.00. Cherry told me he was afraid of suit in Kansas City because of his lack of money and the alleged influence of his opponents with officials, and that C. & C. might bring a suit in an effort to delay action by him in attempting to cancel a license contract under his patents.

"Yours truly,
(Signed) HUBERT E. PECK."

On March 3, 1922, Thomson wrote Peck the following letter, inclosing the check for $500.00:

"Mr. Hubert E. Peck,
Pacific Building,
Washington, D. C.

"Dear Mr. Peck:

"We are attaching hereto check No. 8, $500.00, as per Mr. Thomson's letter of recent date, this check to be applied on the recent Cherry patents, taken out during February, 1922. Kindly send receipts in duplicate, so we in turn may give one to Mr. Cherry,

of the Cherry Process Company, for his file, and we keep one for ours.

"Trusting you will pardon delay in forwarding this remittance, we are,

"Yours very truly,
(Signed) W. A. THOMSON & Co."

L. D. Cherry, who was in fact the 'Cherry Process Company, on March 3, asked Thomson to send the check. Thomson told his stenographer to write a check to the Cherry Process Company for $500.00. Before the check was filled out by her Thomson was called by telephone to his factory and he signed the check in blank, telling his stenographer to fill it out after he left. Before she had done this 'Cherry came in and asked her to make the check payable to H. E. Peck, and this she did, and then wrote a letter inclosing the check to Peck, signing Thomson's name to it. Cherry, in substance, kept his office in Thomson's office and the young lady acted as stenographer for both of them. A day or two later Cherry and Thomson fell out over the terms of the contract between them. Cherry refused to sign the contract as drawn and Thomson notified the bank not to pay the check. In the meantime, however, Peck had cashed the check and testifies as follows as to what he had done:

"When I received this check, on the strength thereof I filed certain Cherry patent applications that I had prepared under Mr. Thomson's original order, and paid all United States government fees in the patent office, and also paid certain draughtmen's bills, and proceeded with further work on certain other Cherry applications under Mr. Thomson's original order."

On these facts the circuit court instructed the jury peremptorily to find for Peck, resting his conclusion largely on the ground of estoppel.

It is clear from his own testimony that Thomson knew that Peck was asking for $500.00, and knew that it had to be paid at once to keep things going in Washington. It is also clear from his own evidence that he directed his stenographer to make out a check for this purpose. If she had followed his instructions and made the check payable to the Cherry Process Company and Cherry had then endorsed the check to Peck and sent it

to him, Thomson's instructions would have been literally carried out. The change that was made was simply to cut out the endorsement, which had in fact no effect on the transaction, for in any event on their settlement Cherry would have been chargeable with the $500.00 sent to Peck. If Thomson's instructions had been literally carried out and Peck had received the check endorsed by the Cherry Company to him, unquestionably Thomson would have been liable under the statute. Thomson cannot maintain that the check was not delivered. The stenographer was his agent. Peck, who received the check without any notice of the secret instructions to the stenographer to fill it out differently, should not suffer, but the principal who gave the authority should rather bear the loss.

The case is not unlike Bassett v. O'Neil, &c., Coal Co., 140 Ky. 346. There the appellant Bassett pleaded that the note was executed by mutual mistake; that the Fall City Brick Manufacturing Company was the real principal in the note; that he was simply a surety thereon; that by mutual mistake the Fall City Brick Manufacturing Company was made the payee in the note instead of the O'Neil, &c., Coal Company, as was intended by all the parties at the time, and that the note was without consideration as far as he was concerned. In answer to this the court said:

"Whether appellant was surety on the note executed to the Falls City Brick Manufacturing Company and indorsed by it to appellee, or was surety for the Falls City Brick Manufacturing Company on a note executed to appellee, his liability would be the same. While there was no consideration moving to appellant, there was a consideration moving to his principal, and that was sufficient to make appellant liable on the note."

This aptly fits the case here. Thomson told his stenographer to write the check to the Cherry Process Company and intended the Cherry Process Company to indorse it to Peck. He intended the check to go to Peck and intended Peck to cash it. It, as filled out to Peck, rested upon an adequate consideration, passing from Peck to Thomson, to-wit: the work Peck had done and was doing and would continue to do. The purpose of the

check was to enable Peck to pay the expenses that had then to be met in Washington and to induce Peck to continue his work on the applications.

Thomson's defense of no consideration rests upon the ground that the sole consideration for the check was Cherry's contract with him, and that Cherry having failed to comply therewith, the consideration failed. But the consideration for the check also moved from Peck. Thomson gave the check to pay expenses necessary for the continuance of the work and to induce Peck to continue his work thereon. Peck accepted the check, cashed it, paid the expenses and went on with the work. This was what Thomson sent the check to obtain. He received the consideration from Peck for which the check was given.

There is no merit in the motion for a new trial on the ground of newly discovered evidence. Peck's deposition was taken some time before the trial. The appellant went into the trial well knowing the statements of the deposition and without making any application for time to take further proof. He took the chances of winning the case on the record, and after so taking the chances he cannot now have a new trial to obtain new evidence as to the amount of Peck's expenses when he did not ask this at the time. Though Peck's expenses out of the check were only $20.00, this was a valuable consideration. Peck went on with the work, and to induce him to do this was the reason for Thomson's sending the check.

Judgment affirmed.